T.C. Memo. 2010-187


UNITED STATES TAX COURT


BONNIE LOU MACGREGOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12150-08.                    Filed August 23, 2010.


Bonnie Lou MacGregor, pro se.

Davis G. Yee, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, Judge:  In a notice of deficiency dated February 11, 2008, respondent determined the following deficiencies and additions to tax with respect to petitioner's Federal income tax:

|      |            | Additions to Tax |                 |          |
|------|------------|------------------|-----------------|----------|
| Year | Deficiency | Sec. 6651(a)(1)  | Sec. 6651(a)(2) | Sec. 6654 |
| 2001 | $17,215    | $3,873           | $4,304          | $688     |
| 2002 | 15,495     | 3,486            | 3,874           | 518      |
| 2003 | 6,171      | 1,388            | 1,419           | 162      |
| 2004 | 6,540      | 1,635            | to be determined | 190     |
| 2005 | 2,251      | 563              | to be determined | 90      |

Petitioner timely filed a petition contesting respondent's determinations. After concessions,[1] the issues for decision are: (1) Whether and to what extent petitioner failed to report income for the years at issue; (2) whether and to what extent petitioner is entitled to business expense deductions with respect to her business activities; and (3) whether petitioner is liable for additions to tax under section 6651(a)(1)[2] for failing to file her 2001-2005 Federal income tax returns, section 6651(a)(2) for failing to pay her 2001-2005 Federal income tax liabilities, and section 6654 for failing to pay estimated tax for the years at issue.[3]

---

[1] On brief petitioner states that respondent's "estimate for rent in 2001 and 2002 is about right, in round numbers." Petitioner also states that "estimates for Social Security benefits are, I assume, correct" and the "estimate for dividends are close enough for our purposes." We construe these statements as petitioner's concessions with respect to the adjustments to rental income in 2001 and 2002, Social Security income in 2001-2003, and dividends in 2003.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

[3] Other adjustments proposed in the notice of deficiency are
(continued...)

FINDINGS OF FACT

None of the facts have been stipulated because petitioner refused to stipulate as required by Rule 91. Petitioner resided in California when she filed her petition. During the years at issue petitioner was not married and had no dependents.

I.   Petitioner's Background and Businesses

Petitioner graduated from college in 1961. Petitioner then attended graduate courses in education at the University of Washington for 1 year but did not complete her graduate degree. Petitioner taught at the high school level, and in 1965-72 she worked for IBM. After working for Royal Typewriter and Xerox in the field of office automation, petitioner worked on a startup team for a small company for 10 years. After a period of unemployment petitioner established an independent consulting practice. Between 1982 and 1994 petitioner owned and operated a restaurant. At some point after 1994 petitioner became an independent consultant in the restaurant and office management industries.

During the years at issue petitioner, in addition to operating her consulting business, occasionally worked part time

---

[3](...continued)
computational. With respect to the standard deductions allowed for 2001, 2002, 2004, and 2005 petitioner does not assert nor does the record allow us to conclude that the itemized deductions are greater than the standard deduction.

for some clients. Petitioner depended mostly on word-of-mouth advertising.

Petitioner did not keep a ledger, journal, or cash receipts book to record receipts generated by her business. Petitioner did not routinely issue any invoices or statements to her customers and instead told her customers what they owed. Petitioner used her bank statements to keep track of her income. When customers paid petitioner by check, she usually deposited the checks at a bank. Sometimes she cashed checks and deposited cash at the bank only when needed. Once or twice customers paid petitioner in cash, in which case petitioner put the payment in a box at her house and deposited the money in her bank account when needed.

In addition to running her consulting business, petitioner marketed educational materials, such as lectures and seminars. Petitioner either developed the educational materials herself or purchased them from professional groups. This business involved mostly telemarketing. Petitioner incurred various expenses related to this business. She purchased prospect lists and incurred costs for online back office, online training costs, and online referral sites. In 2001 and 2002 petitioner incurred $620 of expenses related to this business.

In 2001-2002 petitioner worked part time for Leon Felton (Mr. Felton) managing his personal assets. Petitioner deposited

in her accounts checks from Mr. Felton totaling $36,111. Of those deposits, several checks totaling $427 and $287 in 2001 and 2002, respectively, were reimbursements for various expenses.

In 2000-2004 petitioner owned a condominium at 799 Dahlia Street, unit 601, Denver, Colorado (Denver condominium). Petitioner purchased the Denver condominium for $89,900. Petitioner partially financed the purchase by a nonrecourse loan, which was secured by a mortgage on the property. Petitioner began renting out the Denver condominium in 2001 but evicted the tenants at some point in 2002. In 2004 the bank foreclosed on the property. At the time of the foreclosure sale, the balance of the nonrecourse loan was $86,000. Besides the mortgage interest deduction that respondent allowed, petitioner incurred expenses related to the Denver condominium totaling $371, $5,043, and $2,792 in 2001, 2002, and 2003, respectively.

In the 1990s petitioner invested in J-Mac Enterprises, a real estate partnership. Petitioner owned the interest until the partnership dissolved in 2004. Upon partnership dissolution, petitioner received checks totaling $17,425 which she deposited in her account.

At various points during the years at issue petitioner maintained checking accounts in her name at Bank of America, Northern Trust Bank of California (Northern Trust), and Bank of Marin. In 2001-2005 petitioner also maintained a checking

account at Northern Trust under the name "Highlander Clan", which was a trust that petitioner had set up.  Petitioner was listed on this account as a director.

Petitioner made deposits into the accounts as follows:[4]

|                            | 2001    | 2002    | 2003    | 2004    | 2005   |
|----------------------------|---------|---------|---------|---------|--------|
| Northern Trust (trust)     | $40,526 | $33,452 | $6,826  | $23,819 | $2,927 |
| Northern Trust (personal)  | -0-     | 951     | 100     | 4,471   | 2,388  |
| Bank of America            | 34,573  | 2,871   | -0-     | -0-     | -0-    |
| Bank of Marin              | -0-     | 29,706  | 24,549  | -0-     | -0-    |
| Total                      | 75,099  | 66,980  | 31,475  | 28,290  | 5,315  |

In 2003, 2004, and 2005 petitioner's cash expenditures totaled $4,150, $11,049, and $9,398, respectively.[5]  Petitioner occasionally withdrew cash or wrote checks payable either to herself or to cash.  Her withdrawals were as follows:

| Year | Cash   | Checks payable to cash | Total withdrawals |
|------|--------|------------------------|-------------------|
| 2001 | $1,400 | $5,600                 | $7,000            |
| 2002 | 800    | 25,311                 | 26,111            |
| 2003 | 100    | 1,300                  | 1,400             |
| 2004 | 3,125  | -0-                    | 3,125             |
| 2005 | 2,064  | -0-                    | 2,064             |

---

[4]Consistent with respondent's bank deposits analysis, we do not include returned checks, credits and refunds, interaccount transfers, a check from Title Services, Inc., and a check marked as "for payment of escrow to mortgagor" in the deposits analysis.

[5]The record contains only the totals of the receipts, but petitioner does not allege that respondent calculated her cash expenditures incorrectly.

II.  Substitute Returns Under Section 6020(b)

Beginning with her 1999 taxable year petitioner stopped filing Forms 1040, U.S. Individual Income Tax Return, and she had not filed Forms 1040 to the date of trial.  Petitioner never made any estimated tax payments because "she did not know what to estimate."

Respondent undertook to reconstruct petitioner's income by analyzing petitioner's bank deposits in 2001-2005 and cash purchases in 2003-2005.[6]  Respondent treated petitioner's cash purchases in 2003-2005 as income on the ground that petitioner must have had income in cash at least in the amount that she spent which she never deposited.  Respondent determined that petitioner's cash purchases totaled $4,150, $11,049, and $9,398 in 2003, 2004, and 2005, respectively, and he treated these amounts as part of petitioner's income subject to self-employment tax.

Respondent then used the bank deposits and cash expenditures analysis to prepare substitute returns under section 6020(b) for petitioner's years in issue.  In the notice of deficiency dated February 11, 2008, respondent determined that petitioner's taxable income was as follows:

_____

[6]Petitioner provided respondent with receipts for her purchases, such as food, phone, clothing, and other.

| Year | Taxable Income |
|------|----------------|
| 2001 | $59,877 |
| 2002 | 47,601 |
| 2003 | 18,885 |
| 2004 | 46,131 |
| 2005 | 3,230 |

Respondent also determined that petitioner was liable for additions to tax under sections 6651(a)(1) and (2) and 6654. Petitioner timely petitioned this Court to redetermine the deficiencies and additions to tax. At trial respondent introduced into evidence bank statements, copies of canceled checks, deposit slips, withdrawal slips, and other financial documents with respect to petitioner's bank accounts. The records were authenticated by the testimony of the banks' custodians of the records.

OPINION

I. Procedural Matters

The primary issues in this case are the extent of petitioner's unreported income and whether petitioner is entitled to any business deductions other than the ones respondent allowed. Petitioner, who has the burden of proof, see Rule 142(a), brought only a few documents to trial. She raised a potentially legitimate cash hoard defense to the bank deposits method of income reconstruction but failed to introduce any credible evidence as to how much money she had on hand at the beginning of each year at issue or what portion of that cash

she deposited into her bank accounts.  Petitioner testified that she incurred various expenses for her businesses, but she did not introduce any credible evidence regarding those expenses and on brief failed to cite any specific references to the record to support her assertions.  When questioned by the Court about expenses she incurred in 2003, petitioner could not recall and stated:  "I ran out of time to continue going through what I have to make even these summary sheets like I did for '01 and '02.  It was midnight last night when I was working on this."

Petitioner's lack of preparation is a problem of her own making because she had adequate notice of the trial date. Respondent mailed petitioner the notice of deficiency on February 11, 2008, and petitioner mailed her petition on May 12, 2008.  On December 5, 2008, more than 5 months before the trial date, we served petitioner with a notice setting case for trial in San Francisco, California, at the session beginning on May 11, 2009.[7]  Petitioner failed to comply with the Court's orders to prepare her case for trial and either obtain counsel or undertake a good faith effort to prepare for trial herself.

On May 7, 2009, less than a week before the May 11, 2009, date set for trial, the Court received petitioner's motion for continuance.  Rule 133 provides that a motion for continuance filed within 30 days of the trial date will be denied unless the

---

[7]Petitioner did not recall receiving these documents.

ground for continuance arose during that period or there is a
good reason for not having made the motion sooner.[8]  Petitioner
filed the motion on the ground that after receiving respondent's
proposed stipulations on April 17, 2009, she realized that she
was unprepared to handle a trial by herself and would seek the
assistance of counsel.  Petitioner's motion was dilatory, and we
denied the motion.  Petitioner's delay in preparation for trial
or hiring counsel until receiving respondent's proposed
stipulations may not serve as a ground for continuance.  See
Rule 133.  We explained to petitioner during a pretrial
conference call and at trial that we denied the motion because
it was untimely and because petitioner did not do anything to
prepare for trial.[9]

---

[8]Rule 133 provides in part:

Continuances will be granted only in exceptional
circumstances.  * * *  A motion for continuance, filed
30 days or less prior to the date to which it is
directed, may be set for hearing on that date, but
ordinarily will be deemed dilatory and will be denied
unless the ground therefor arose during that period or
there was good reason for not making the motion sooner.
* * *

[9]As we observed in another context in Brooks v.
Commissioner, 82 T.C. 413, 429-430 (1984), affd. without
published opinion 772 F.2d 910 (9th Cir. 1985):

The Office of the Court is in Washington, D.C., but
trial sessions are held in various cities * * * for the
convenience of the parties.  Secs. 7445, 7446; Rules
10, 140.  When cases are at issue, they are scheduled
on the next available calendar in the place requested

(continued...)

When this case was called for trial at the calendar call, petitioner stated that she was not ready to proceed to trial that week. Petitioner also faxed documents entitled "Motion for Reconsideration and Certificate of Unpreparedness". Petitioner sought to file the same documents again during trial. Because such documents are not proper documents under the Rules, we directed that the documents not be filed but construed them as a request for continuance. We explained to petitioner during trial that continuances are granted only in exceptional circumstances and because petitioner did not do anything to prepare the case for trial, we would not grant a continuance.

---

[9](...continued)
for trial, generally in order of filing, and notice of trial is sent. * * * The judge, trial clerk, and reporter are assigned, and the courtroom space is reserved. When a case set for trial is not resolved during a trial session in which time has been set aside for it, a substantial waste of the Court's resources results.

Delays also affect other taxpayers who are awaiting the opportunity to have their cases heard. Only a certain number of cases can be placed on any particular trial calendar. Each time that a case scheduled for trial does not proceed, time is wasted that could have been spent on other cases if they could have been scheduled. Respondent's counsel is required to spend time preparing cases for trial which could be spent working with taxpayers on other cases and attempting to settle them. These unnecessary burdens on the system are unreasonable and unfair from the standpoint of everyone involved. [Citations and fn. refs. omitted.]

Throughout the calendar call and the trial and on brief petitioner lamented that the Court "required her to defend herself without assistance of counsel" while she is incapable of doing so and blamed her unpreparedness on appearing without counsel. In petitioner's words, she "did not feel capable of conducting * * * trial" and she could not afford counsel.[10]

In addition to failing to prepare for trial, petitioner refused to cooperate with respondent's counsel in the stipulation process. Respondent's counsel drafted numerous stipulations of facts, but petitioner refused to sign them and to stipulate the exhibits. After the calendar call, on May 15, 2009, respondent's counsel again contacted petitioner regarding the stipulations of facts before the trial was scheduled to commence. However, petitioner again refused to sign the stipulations. Instead, petitioner offered a two-paragraph stipulation that respondent's counsel did not sign because it failed to encompass all of petitioner's bank records.

As noted above, on December 5, 2008, we served petitioner with a notice setting case for trial in San Francisco, California, at the session beginning on May 11, 2009. The notice directed the parties to "agree in writing to all facts and all documents about which there should be no disagreement."

_____

[10]At calendar call the Court encouraged petitioner to consult one of the two volunteer attorneys who were present and could have assisted her in reviewing stipulations.

The notice was accompanied by the Court's standing pretrial order which required the parties to cooperate and stipulate facts to the maximum extent possible.  The standing pretrial order states in pertinent part:

> The parties shall begin discussions as soon as practicable for purposes of settlement and/or preparation of a stipulation of facts.  * * *  All minor issues should be settled so that the Court can focus on the issue(s) needing a Court decision.
>
>     \*     \*     \*     \*     \*     \*     \*
>
> Continuances will be granted only in exceptional circumstances.  See Rule 133, Tax Court Rules of Practice and Procedures.  (The Court's Rules are available at www.ustaxcourt.gov.)  Even joint motions for continuance will not routinely be granted.
>
>     \*     \*     \*     \*     \*     \*     \*
>
> To facilitate an orderly and efficient disposition of all cases on the trial calendar, it is hereby
>
> **ORDERED** that all facts shall be stipulated to the maximum extent possible.  * * *  Objections may be preserved in the stipulation.  If a complete stipulation of facts is not ready for submission at the commencement of the trial or at such other time ordered by the Court, and if the Court determines that this is the result of either party's failure to fully cooperate in the preparation thereof, the Court may order sanctions against the uncooperative party.

See also Rule 91(a).  Petitioner's refusal to stipulate and failure to prepare for trial violated the Court's standing pretrial order.

At trial and on brief petitioner stated that she did not know what respondent's case would consist of, what witnesses would testify, and what arguments respondent would rely on.

Petitioner's complaint is ungrounded.  Forms 4549-A, Income Tax Discrepancy Adjustments, attached to the notice of deficiency, set out respondent's adjustments.  Petitioner received the Forms 4549-A along with the notice of deficiency on or after February 11, 2008, more than 1 year before the May 11, 2009, trial.  Petitioner also received respondent's pretrial memorandum, which set forth the issues in the case, witnesses that respondent expected to call, summary of the facts, and synopsis of legal authorities on which respondent relied.

II.  Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer generally bears the burden of showing they are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie, absent a stipulation to the contrary, see sec. 7482(b)(1)(A), has held that for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must establish "some evidentiary foundation" connecting the taxpayer with the income-producing activity, see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or demonstrating that the taxpayer actually received unreported income, Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982)

- 15 -

(holding that the Commissioner's assertion of a deficiency is presumptively correct once some substantive evidence is introduced demonstrating that the taxpayer received unreported income). If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the deficiency was arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C. Memo. 1997-97.

Petitioner deposited cash into her bank accounts, and bank deposits evidence receipt of income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). In addition, respondent has introduced evidence that petitioner had income-producing activities during the years at issue. Accordingly, the burden of production shifted to petitioner to prove that respondent's adjustments in the notice of deficiency were arbitrary or erroneous. Consequently, petitioner bears the burden of proof and the burden of production with respect to all adjustments affecting her liability for the tax deficiencies. In addition, petitioner does not contend that section 7491(a) shifts the burden of proof to respondent, nor does the record establish that petitioner satisfies the section 7491(a)(2) requirements.

III. Petitioner's Income for 2001-2005

    A.   In General

Section 6001 requires a taxpayer to maintain sufficient records to allow the determination of the taxpayer's correct tax liability. Petzoldt v. Commissioner, 92 T.C. 661, 686 (1989). Petitioner failed to fulfill that responsibility.

When a taxpayer fails to keep adequate books and records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. See sec. 446(b); Petzoldt v. Commissioner, supra at 693. The Commissioner may use indirect methods, and he is given latitude in determining which method of reconstruction to apply when a taxpayer fails to maintain adequate books and records. Petzoldt v. Commissioner, supra at 693. The Commissioner's reconstruction of a taxpayer's income need only be reasonable in the light of all surrounding facts and circumstances. Id. at 687 (citing Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970), and Schroeder v. Commissioner, 40 T.C. 30, 33 (1963)).

One of the indirect methods of reconstructing income is the bank deposits method. "The use of the bank deposit method for computing income has long been sanctioned by the courts." Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Bank deposits constitute prima

facie evidence of income.  Tokarski v. Commissioner, supra at 77; see also Clayton v. Commissioner, 102 T.C. 632, 645 (1994). When a taxpayer keeps inadequate or incomplete books or records and has large bank deposits, the Commissioner is not acting arbitrarily or capriciously by resorting to the bank deposits method.  See DiLeo v. Commissioner, 96 T.C. 858, 867-868 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  The bank deposits method of reconstruction assumes that all of the deposits into a taxpayer's account are taxable income unless the taxpayer can show that the deposits are not taxable.  See id. at 868; see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). The Commissioner need not show a likely source of the income when using the bank deposits method, but the Commissioner must take into account any nontaxable items or deductible expenses of which the Commissioner has knowledge.  See Price v. United States, supra at 677.

Respondent introduced adequate evidence to show that petitioner received unreported income in 2001-2005.  The record contains canceled checks, bank statements, deposit slips, and other documentary evidence.  Petitioner admits that at various times during the years at issue she rented out her condominium, engaged in the business of selling educational materials, worked for Mr. Felton, offered services as an independent consultant, and occasionally worked part time for various clients.  We find

that it was reasonable for respondent to use an indirect method, i.e., the bank deposits and cash expenditures method, to reconstruct petitioner's income.  Accordingly, the burden of proof falls on petitioner to demonstrate that respondent's determinations are arbitrary or erroneous.

For each year at issue respondent applied the bank deposits method.  Respondent identified four bank accounts that petitioner used in 2001-2005 and summoned the bank records.  Respondent analyzed each account and performed a bank deposits analysis to identify unreported gross income.  He totaled all deposits into petitioner's accounts during the years at issue.  Respondent's revenue agent Michelle Jirasek (Ms. Jirasek) credibly testified, and her bank deposits analysis spreadsheet supports her testimony, that she eliminated from taxable deposits the items that she identified as nontaxable, such as interaccount transfers or returned checks.

With respect to 2003-2005 respondent also analyzed petitioner's expenditures in reconstructing her income.  The cash expenditures method assumes that the amount by which a taxpayer's expenditures during the relevant period exceed reported income has taxable origins absent some explanation by the taxpayer.  Petzoldt v. Commissioner, supra at 694.  The relevant issue in a cash expenditures analysis is whether any expenditures in excess of reported income can be attributed to

assets available at the beginning of the relevant period or to nontaxable receipts, such as loans, gifts, or inheritances. Id. at 695 (citing Taglianetti v. United States, 398 F.2d 558, 566 (1st Cir. 1968), affd. 394 U.S. 316 (1969)).

At trial respondent introduced a spreadsheet documenting the bank deposits and cash expenditures analysis and copies of petitioner's bank statements, canceled checks, and deposit slips. The burden is on petitioner to show that respondent's analysis is unfair or inaccurate. See Price v. United States, supra at 677; Petzoldt v. Commissioner, 92 T.C. at 697. Alternatively, petitioner may demonstrate a nontaxable source for the cash. See Price v. Commissioner, supra at 677; Petzoldt v. Commissioner, supra at 696-697. In sum, we accept respondent's reconstruction of petitioner's income as reasonable and accurate with the exception of the items addressed below.

B.  Disputed Items of Income

The following items of income remain in dispute:

| Item | 2001 | 2002 | 2003 | 2004 | 2006 |
|---|---|---|---|---|---|
| Other income-- not subject to self- employment tax | $22,171 | -0- | -0- | -0- | -0- |
| Other income--subject to self-employment tax | 31,360 | $44,515 | $26,118 | $15,878 | $13,644 |
| Capital gain | -0- | -0- | -0- | 40,525 | -0- |

We consider each adjustment below.

1. Other Income--Not Subject to Self-Employment Tax (2001)

Petitioner contends that the $22,171 she received in 2001 represented proceeds of a personal injury settlement and is not taxable. Generally, section 61(a) includes in gross income "all income from whatever source derived" unless excluded by a specific provision of the Code. This section is construed broadly to encompass any accession to a taxpayer's wealth. Commissioner v. Schleier, 515 U.S. 323, 327-328 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 430 (1955). Exclusions from gross income are matters of legislative grace and are construed narrowly to maximize the taxation of any accession to wealth. United States v. Burke, supra at 248 (Souter, J., concurring). Section 104(a)(2) excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness".

Where damages are received pursuant to a settlement agreement, the nature of the claim that was the basis for the settlement determines whether the damages are excludable from gross income under section 104(a)(2). United States v. Burke, supra at 237. To be excludable from gross income under section 104(a)(2), a settlement award must be paid to a taxpayer on account of physical injury or physical sickness. See, e.g.,

Longoria v. Commissioner, T.C. Memo. 2009-162. The determination of the underlying nature of the claim is factual and generally is made by reference to the settlement agreement in the light of the surrounding circumstances. Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part and remanded on another issue 70 F.3d 34 (5th Cir. 1995); Seay v. Commissioner, 58 T.C. 32, 37 (1972).

To justify excluding the $22,171 from income under section 104, petitioner must show the nature of the claim which was the actual basis for the settlement and that her settlement proceeds were in lieu of damages for physical injuries or physical sickness. The record contains a copy of the check from Vasquez & Vasquez. The check memo line notes: "MacGregor v. Alpine". Petitioner also attached to her brief a document entitled "Settlement Statement" which purports to summarize the calculation of the settlement amount. Petitioner did not offer the settlement statement, which references medical bills and has the handwritten notation "Foot injury", in evidence at the trial. A document that is attached to a posttrial brief but not admitted into evidence at trial is not part of the record, and the taxpayer may not rely on such a document. See Rule 143(c); Washington v. Commissioner, 120 T.C. 114, 123 n.11 (2003). Although petitioner appears in this proceeding pro se, her failure to cooperate in preparing this case for trial gives us no

reason to disregard our Rules. See Lopez v. Commissioner, T.C. Memo. 2001-93. Accordingly, we sustain respondent's determination with respect to this adjustment.

### 2. Other Income--Subject to Self-Employment Tax (2001-2005)

We summarize our findings with respect to respondent's bank deposits analysis in the appendix.

### a. Petitioner's Challenges

Relying on the bank deposits and cash expenditures analysis, respondent determined petitioner's category of income "Other income--subject to self-employment tax" as follows:

| Item | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Cash | $5,540 | $17,713 | $8,843 | $2,574 | $1,973 |
| Paypal | -0- | -0- | 2,550 | -0- | -0- |
| Mr. Felton | 17,654 | 19,117 | -0- | -0- | -0- |
| I-Promotion | -0- | 282 | 605 | -0- | -0- |
| Other | 6,541 | 7,404 | 9,969 | 2,256 | 2,273 |
| Elliot Mgmt. | 1,625 | -0- | -0- | -0- | -0- |
| Cash expenditures | -0- | -0- | 4,150 | 11,049 | 9,398 |
| Total | 31,360 | [1]44,516 | [1]26,117 | [1]15,879 | 13,644 |

[1]The discrepancy with the notice of deficiency is due to rounding.

For 2003, 2004, and 2005 respondent also added cash expenditures of $4,150, $11,049, and $9,398, respectively.

Petitioner contests respondent's determinations of the amounts of income subject to self-employment tax. First, petitioner contends that the checks from Mr. Felton deposited on March 26 and July 9, 2002, were repayments of loans she had advanced to him. The disputed checks bear notations "IGP GII

Seminar Purchase", "IGP GI Course", and "Final".  Petitioner made self-serving statements in her posttrial brief in support of her argument but presented no evidence at trial that these checks were repayment of loans.  See Tokarski v. Commissioner, 87 T.C. at 77. Accordingly, we sustain respondent's determination with respect to these checks.

Second, petitioner contends that respondent failed to connect amounts of cash deposits, "other deposits", and cash expenditures with an income-producing activity.  Whether the Commissioner produces evidence that the taxpayer received income affects the allocation of the burden of proof, rather than the taxpayer's liability.  Cf. Hardy v. Commissioner, 181 F.3d at 1004-1005.  If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous.  Kudo v. Commissioner, 11 Fed. Appx. 864, 866 (9th Cir. 2001), affg. T.C. Memo. 1998-404; Hardy v. Commissioner, supra at 1004.  Respondent produced evidence of unreported income, see supra p. 17, and the record contains evidence that petitioner engaged in income-producing activities during the years at issue.  Petitioner bears both the burden of production and the ultimate burden of proof.  We reject petitioner's argument that respondent failed to link the unreported income with an income-producing activity.

Third, petitioner challenges respondent's bank deposits analysis on the ground that at trial respondent failed to explain how he arrived at the amounts. Petitioner's argument is unfounded. At trial Ms. Jirasek explained how she calculated the total amounts of income subject to self-employment tax for 2001 and 2002 and how the spreadsheet, which is part of the record, supports her calculations. She also addressed how she calculated petitioner's cash expenditures for 2004 and then stated that she used a similar process for other years. Respondent explained his methodology with sufficient clarity, and we reject petitioner's argument.

      b.   <u>Additional Findings With Respect to the Bank Deposits Analysis</u>[11]

Upon our review of petitioner's bank records and respondent's bank deposits analysis, we also find as follows:[12]

---

[11]The parties did not address the items discussed in this part.

[12]In addition to our findings in this section, we note that we included the $660 check deposited on Mar. 21, 2002, as part of the "other" category, rather than a payment from Mr. Felton because the relevant check was issued to petitioner by Sausalito Art Festival, LLC. The correction, however, does not change the amount of income subject to self-employment tax.

Petitioner's $100 deposit on Aug. 28, 2002, is properly included in the "other" category of deposits rather than nontaxable credit/refund. However, because respondent does not assert an increased deficiency on brief with respect to this deposit, we shall disregard the deposit in our analysis.

Petitioner's $74 deposit dated Sept. 15, 2003, into her Bank
(continued...)

- For 2002 we decreased deposits into petitioner's Bank of Marin account by $316, which represents the total of checks deposited on April 11 and July 9, 2002, because the notations on the checks show those payments were refunds.[13]

- We increased petitioner's 2003 cash deposits by a $10 deposit into Bank of Marin dated August 29, 2003, because respondent's summary sheet omitted that deposit.

- We decreased petitioner's 2001 "other" deposits into the trust account at the Northern Trust by $10 because the record establishes the relevant check was in the amount of $153 but was recorded in the analysis as $163.

- We excluded a $500 deposit dated March 8, 2004, from deposits into petitioner's Northern Trust personal account because the record establishes it was a nontaxable transfer from petitioner's trust account at Northern Trust.

---

[12](...continued)
of Marin account bears the notation "postage for volunteer letters", but petitioner did not argue that this deposit is nontaxable. Because petitioner bears the burden of proof, see Rule 142, we sustain respondent's determination with respect to this item.

[13]As refunds, such amounts do not represent income to petitioner, and accordingly should not be part of deposits.

- We find that petitioner withdrew $500 from the trust account on March 8, 2004, rather than $1,000 as respondent determined.

- We find that on April 22, 2004, petitioner deposited $354 of her Social Security check into the trust account and withdrew $200 from the trust account. Respondent had determined that on that date petitioner deposited $854 and withdrew $500 from the trust account.

- We find that on August 18, 2004, petitioner deposited $754 of her Social Security check into the trust account and withdrew $354. Respondent had determined that petitioner deposited $854 and withdrew $454 from the trust account.

- We find that on October 5, 2005, petitioner deposited $753 of her Social Security check into the trust account and withdrew $553. Respondent had determined that petitioner had deposited $200.

- We exclude from the taxable deposits checks from Mr. Felton totaling $427 and $287 that petitioner deposited in 2001 and 2002, respectively, into her Bank of Marin and Bank of America accounts. These checks bear notations "reimb.-office supplies and equipment", "reimbursement-postage", or a similar notation, and we

find Mr. Felton reimbursed petitioner for various supplies, postage, or similar expenses.

c.    The Cash Hoard and Redeposit Defenses

Petitioner contends on brief that respondent's bank deposits and cash expenditures analysis is unreliable because it ignores the cash petitioner had on hand at the beginning of 2001. Petitioner also claims that she had some assets offshore at the beginning of 2001.[14]  Petitioner claims she prefers "the anonymity of cash" to maintain her privacy and has kept "significant sums in cash rather than in the bank" for at least 10 years.  Petitioner testified and states on brief that in 2000 she sold her houseboat at a profit of over $100,000 and kept a large part of the proceeds in cash.  Petitioner claims that she spent $33,220 of that cash when she purchased her Denver condominium.  Petitioner also states on brief that between 2000 and 2004 she invested $102,500 but lost her investments.  At trial petitioner estimated her real estate investments made with cash, including the proceeds from the sale of the houseboat, totaled approximately $225,000.  According to petitioner, after her investments she had approximately $5,000 or $6,000, and on

---

[14]Petitioner's application for a mortgage for the purchase of the Denver condominium indicates that her assets offshore totaled "100M".  Petitioner acknowledges that at the beginning of 2001 she had assets offshore but disputes that "100M" referred to $100 million.  We need not resolve the dispute regarding the amount of cash petitioner had offshore because we reject the cash hoard defense for lack of credible evidence in the record.

several occasions in 2003-2005 she deposited some of that cash into her bank accounts. According to petitioner, she used her "cash stash" to pay living expenses.

Petitioner failed to present any credible evidence to corroborate her testimony. She presented no documentary evidence that she sold her houseboat and received the proceeds in cash. No witnesses with knowledge of petitioner's cash at home testified at trial. Petitioner did not explain the source of the over $200,000 she claimed she invested in real estate, nor did she credibly quantify her gain from the sale of the houseboat; she testified that it was $100,000. Even if we were to accept that petitioner had cash on hand, petitioner failed to establish how much cash she had at the beginning of each year at issue.

Although her argument is not entirely clear, petitioner appears to challenge the bank deposits analysis on the ground that she redeposited the cash she had withdrawn from her accounts. The record supports a finding that in 2001-2005 petitioner withdrew $39,700 from her accounts and deposited $35,953.[15] However, on this record we cannot conclude that petitioner's cash deposits and withdrawals represented a circular flow of cash. While it is possible that petitioner redeposited

_____

[15]Respondent's bank deposits analysis includes a column for cash withdrawals, but the analysis ignores checks written to petitioner or to cash. Because checks written to petitioner or to cash are equivalent to cash withdrawals, we include all such withdrawals in our analysis.

some cash, petitioner presented no credible evidence to establish the extent of any redeposits, and the record does not allow us to conclude that all cash deposits were in fact redeposits. It is petitioner who bears the burden of proof, see Rule 142, and petitioner failed to carry that burden and establish the extent of her redeposits.

Petitioner also challenges respondent's cash expenditures analysis for 2003-2005 on the ground that she kept cash "outside the banking system." The relevant issue is whether any of petitioner's expenditures in 2003-2005 can be attributed to assets available at the beginning of 2003 or to nontaxable receipts. See Petzoldt v. Commissioner, 92 T.C. at 695 (citing Taglianetti v. United States, 398 F.2d at 566). Petitioner testified that she invested most of the sale proceeds and on several occasions deposited the remaining $5,000 or $6,000 in 2003-2005 into her bank accounts. This testimony contradicts petitioner's proffered explanation that she used the cash she had left after the houseboat sale for living expenses.

The record reveals that petitioner's withdrawals from her bank account totaled $33,111 in 2001-2002 and $6,589 in 2003-2005.[16] However, the record contains no evidence to support a

---

[16]On brief respondent contends that in the bank deposits analysis he "accounted for certain cash deposits" and refers to deposits that equaled petitioner's cash withdrawals. However, respondent's bank deposits analysis shows that although

(continued...)

finding that the sources of funds for the cash expenditures were in fact petitioner's cash withdrawals.

It is the taxpayer's responsibility to maintain adequate records that would allow the determination of the taxpayer's correct tax liability. See sec. 6001; Petzoldt v. Commissioner, supra at 686-687; sec. 1.446-1(a)(4), Income Tax Regs. As discussed above, the Commissioner's determination has the presumption of correctness, and the taxpayer bears the burden of proof. Rule 142(a). In the absence of any credible evidence regarding a cash hoard, cash withdrawals as the source of funds for the cash expenditures, or redeposits, we decline to infer that petitioner either redeposited the cash she had previously withdrawn or paid her expenses in 2003-2005 with that cash.

### 3.   Capital Gain (2004)

In the notice of deficiency respondent determined that in 2004 petitioner had a $40,525 capital gain. Respondent explains that this adjustment consists of a $23,100 gain on the foreclosure of the Denver condominium and a $17,425 gain related to the sale of petitioner's interest in J-Mac Enterprises.

---

[16](...continued)
respondent subtracted cash withdrawals from the total daily deposits, the cash withdrawals did not affect the categories of taxable deposits. Because respondent did not use the total daily deposits column for calculating taxable income and instead added specific categories to calculate petitioner's self-employment income, we find that respondent did not factor cash withdrawals into his bank deposits analysis.

### a. Gain on the Foreclosure Sale

In general section 61(a)(3) provides that gross income includes gains derived from dealings in property. Section 1001(a) provides that gain from the sale or other disposition of property is the excess of the amount realized over the property's adjusted basis and that loss from the sale or other disposition of property is the excess of the property's adjusted basis over the amount realized. The transfer of property in consideration of the discharge or reduction of indebtedness is equivalent to the sale of property upon which gain or loss is realized.[17] See Frazier v. Commissioner, 111 T.C. 243, 245 (1998).

For purposes of calculating gain or loss, the amount realized is the sum of any money received plus the fair market value of the property received. Sec. 1001(b). Generally, and subject to exceptions not relevant in this case, the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged

---

[17]A debtor's transfer of property to a creditor in satisfaction of a nonrecourse liability is treated as a sale or other disposition of property, and any resulting income constitutes gain on the disposition of property, rather than discharge of indebtedness income. Coburn v. Commissioner, T.C. Memo. 2005-283. On the other hand, a debtor's transfer of property subject to a recourse liability results in gain from the sale or other disposition of property to the extent that the fair market value of the property exceeds its basis and, to the extent that the liability exceeds the property's fair market value, the debtor realizes discharge of indebtedness income. Frazier v. Commissioner, 111 T.C. 243, 245 (1998); Coburn v. Commissioner, supra.

- 32 -

as a result of the sale or disposition. Sec. 1.1001-2(a), Income Tax Regs. The amount realized from the transfer of the property in consideration of the discharge or reduction of indebtedness depends on whether the liability is recourse or nonrecourse. See Frazier v. Commissioner, supra at 245. If the liability is nonrecourse, the amount realized includes the full amount of the remaining debt, and the fair market value of the property is irrelevant. See Commissioner v. Tufts, 461 U.S. 300, 317 (1983); Frazier v. Commissioner, supra at 245. If the debt is recourse, the amount realized is the fair market value of the property. Frazier v. Commissioner, supra at 245.

The mortgage documents are not in the record. Respondent assumed in making his determination that petitioner's liability was nonrecourse, and petitioner does not disagree. In fact, on brief petitioner agrees that the amount realized was $86,000 as respondent determined. Accordingly, we shall not disturb respondent's determination that the loan was nonrecourse and the amount petitioner realized on the foreclosure sale was $86,000.

Petitioner, however, challenges respondent's determination that her basis in the property was $62,900. At trial Ms. Jirasek did not remember how she had calculated petitioner's basis and guessed she had done so using information in the original loan document. The original loan document is not part of the record. The record contains only a "Uniform Residential Loan Application

Charterwest Mortgage, LLC" dated April 17, 2002 (loan application), that relates to refinancing of the Denver condominium. The loan application shows the original cost of the condominium was $89,900 and the amount of existing liens was $62,900. The $89,900 original cost specified in the loan application is consistent with petitioner's testimony that she paid $89,900 for the Denver condominium and that she used some cash proceeds from the sale of her houseboat and borrowed the rest. On the other hand, respondent's determination that the basis was $62,900 appears inconsistent with the loan application, and at trial Ms. Jirasek could not explain how she had arrived at that number. We find that petitioner's basis was $89,900 and petitioner had no gain on the foreclosure.

Petitioner also suggests that her basis in the Denver condominium should include $6,000 she spent to replace the windows. However, the record contains no credible evidence documenting that petitioner replaced windows in the Denver condominium or the cost thereof, and statements in brief are not evidence. Rule 143(c). Accordingly, we conclude that petitioner failed to prove that an adjustment to basis for window replacements in the Denver condominium is appropriate.

b. Gain on the Sale of the Partnership Interest

Respondent determined that petitioner realized and must recognize gain on the sale of her interest in J-Mac Enterprises

on the basis of two cashier's checks totaling $17,425. Petitioner contends that respondent improperly treated the cashier's check deposits as proceeds from the sale of her interest in J-Mac Enterprises. We disagree.

The record contains a summary of Ms. Jirasek's interview with petitioner on December 13, 2007. The notes show that during the interview Ms. Jirasek asked petitioner about the deposits from Jefferson Title Co. and that petitioner stated those deposits were probably from the buyout of her partnership interest. Petitioner also provided Ms. Jirasek with a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for J-Mac Enterprises for 2004, which respondent introduced into evidence. Ms. Jirasek concluded that the proceeds were from the sale of a partnership interest because the Schedule K-1 was marked as a final schedule.

Petitioner also argues that respondent failed to give her credit for any basis in the partnership interest. Petitioner, however, did not present any evidence at trial regarding her basis in the partnership interest, nor did she testify as to how much she had invested in J-Mac Enterprises. Petitioner relies on a handwritten page purporting to show her contributions to the partnership totaling $23,150 in 1990-2003 that she attached to her posttrial brief. The bottom of the page bears a notation:

"7-03  Prepared by Kristine Jasiecki[18] & I agreed".

Petitioner's reliance on statements and documents that were not introduced into evidence at trial is improper.  See Rule 143(c). We sustain respondent's determination with respect to the capital gain on the sale of the partnership interest for 2004.

IV.  Petitioner's Business Expenses for 2001-2005

Generally, deductions and credits are a matter of legislative grace, and the taxpayer bears the burden of proving that she is entitled to any deduction or credit claimed.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  This includes the burden of substantiation.  Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Section 162(a) allows a taxpayer to deduct ordinary and necessary expenses of carrying on the taxpayer's trade or business.  To be engaged in a trade or business with respect to which deductions are allowable under section 162, "the taxpayer must be involved in the activity with continuity and regularity", and "the taxpayer's primary purpose for engaging in the activity must be for income or profit."  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  A sporadic activity or a hobby does not qualify.  Id.  An expense is ordinary if it is normal, usual, or

---

[18]The record establishes that Kristine Jasiecki was another partner in J-Mac Enterprises.

customary within a particular trade, business, or industry or arises from a transaction "of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary if it is "'appropriate and helpful'" for the development of the business. Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 353 (1971) (quoting Commissioner v. Tellier, 383 U.S. 687, 689-690 (1966)). Section 212 allows deductions for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

When a taxpayer establishes that he paid or incurred a deductible expense but does not establish the amount of the expense, we may estimate the amount allowable in some circumstances (the Cohan rule). See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). There must be sufficient evidence in the record, however, to permit us to conclude that the taxpayer paid or incurred a deductible expense in at least the amount allowed. See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). In estimating the amount allowable, we bear heavily upon the taxpayer who failed to maintain required records and to substantiate deductions as the Code requires. See Cohan v. Commissioner, supra at 544.

Petitioner alleges that respondent failed to allow deductions for certain business expenses, such as property taxes, homeowners association fees, and utilities but does not point to any evidence in the record that identifies specific rental business expenses that she paid. Nevertheless, the record shows that petitioner paid expenses related to the Denver condominium totaling $371, $5,043,[19] and $2,792 in 2001, 2002, and 2003, respectively. Notations on the canceled checks that support this additional deduction refer to "HOA fees", "Dahlia", or the partial address of the Denver condominium. Accordingly, we allow petitioner to deduct these expenses. However, we do not allow any deductions for expenses petitioner testified she incurred for title insurance; replacement of an air conditioner, microwave, and windows; patching holes in the walls; and painting the Denver condominium, because the record contains no credible evidence to support deductions for those expenses.

With respect to petitioner's marketing business, petitioner testified that she incurred expenses for purchasing educational materials, but she failed to produce credible evidence of those expenses at trial. The record does contain three checks totaling $620, dated January 16, 2001, and March 28, 2002, that show

---

[19]Petitioner testified that maintenance and repair expenses in 2002 were $6,988.53, but she produced no records at trial. Petitioner attached to her brief a spreadsheet summarizing, inter alia, her expenses. However, statements on brief are not part of the record. See Rule 143(c).

petitioner purchased educational tapes. We find that these expenses related to petitioner's marketing business, and we allow a deduction for these expenses.

Petitioner testified that some of her records were destroyed by fire. She also admitted that she had some documentation but that she had not brought it to Court. Because petitioner introduced no credible evidence that she actually paid any expenses other than those allowed above, the Cohan rule is not applicable in this case.

V.    Additions to Tax

Section 7491(c) provides that the Commissioner bears the burden of production with respect to the liability of any taxpayer for any penalty or addition to tax. To satisfy his burden of production under section 7491(c), the Commissioner must produce evidence that it is appropriate to impose the relevant addition to tax. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, section 7491(c) does not require the Commissioner to introduce evidence regarding reasonable cause. Id.

In a proceeding before this Court, the Commissioner's obligation under section 7491(c) initially to come forward with evidence that it is appropriate to apply a particular penalty against a taxpayer is conditioned upon the taxpayer's assigning error to the Commissioner's penalty determination. Funk v.

<u>Commissioner</u>, 123 T.C. 213, 217-218 (2004); <u>Swain v. Commissioner</u>, 118 T.C. 358 (2002).  We have held that a taxpayer who fails to assign error to a penalty or addition to tax is deemed under Rule 34(b)(4) to have conceded the penalty or addition to tax.  See <u>Funk v. Commissioner</u>, <u>supra</u> at 217-218 (holding that the Commissioner's burden of production under section 7491(c) with regard to additions to tax is not applicable when a pro se taxpayer's petition failed to state a claim with respect to additions to tax); <u>Swain v. Commissioner</u>, <u>supra</u> at 363 (holding that a pro se taxpayer conceded penalties when she failed to assign error to the Commissioner's determination of penalties).

Respondent has determined that petitioner is liable for additions to tax under sections 6651(a)(1) and (2) and 6654.  The petition contains no allegations regarding any of the additions to tax that respondent determined in the notice of deficiency.  We deem petitioner to have conceded these issues and hold that respondent has no burden of production under section 7491(c) as to the additions to tax.  See <u>Funk v. Commissioner</u>, <u>supra</u> at 217-218; <u>Swain v. Commissioner</u>, <u>supra</u> at 363.  We sustain respondent's determinations as to the additions to tax under sections 6651(a)(1) and (2) and 6654.

We have considered the remaining arguments made by the parties and, to the extent not discussed above, conclude those

arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

- 41 -

APPENDIX

| Security | Social Cash | Paypal | Rent | Felton | Mr. Promotion | I-2000 | Energy Other | Mgmt. | Elliot Settlement | Court Distrib. | Pship. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2001** | | | | | | | | | | | |
| N. Trust (trust) | -0- | $3,000 | -0- | $12,455 | $17,227 | -0- | -0- | $6,219 | $1,625 | -0- | -0- |
| Bank of America | $9,549 | 2,540 | $1 | -0- | -0- | -0- | -0- | 312 | -0- | $22,171 | -0- |
| Total | 9,549 | 5,540 | 1 | 12,455 | 17,227 | -0- | -0- | 6,531 | 1,625 | 22,171 | -0- |
| **2002** | | | | | | | | | | | |
| N. Trust (trust) | -0- | -0- | -0- | $11,910 | $18,170 | $282 | -0- | $3,090 | -0- | -0- | -0- |
| N. trust (personal) | -0- | 800 | -0- | -0- | -0- | -0- | -0- | 151 | -0- | -0- | -0- |
| Bank of America | $1,756 | $1,115 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| Bank of Marin | 9,401 | 15,798 | -0- | -0- | -0- | -0- | -0- | 4,507 | -0- | -0- | -0- |
| Total | 11,157 | 17,713 | -0- | 11,910 | 18,170 | 282 | -0- | 7,748 | -0- | -0- | -0- |
| **2003** | | | | | | | | | | | |
| N. Trust (trust) | -0- | $683 | $2,550 | -0- | -0- | $605 | $1,068 | $1,920 | -0- | -0- | -0- |
| N. Trust (personal) | -0- | 100 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| Bank of Marin | $8,430 | 8,070 | -0- | -0- | -0- | -0- | -0- | 8,049 | -0- | -0- | -0- |
| Total | 8,430 | 8,853 | 2,550 | -0- | -0- | 605 | 1,068 | 9,969 | -0- | -0- | -0- |
| **2004** | | | | | | | | | | | |
| N. Trust (trust) | $3,310 | $1,454 | -0- | -0- | -0- | -0- | -0- | $1,630 | -0- | -0- | $17,425 |
| N. trust (personal) | 1,681 | 620 | -0- | -0- | -0- | -0- | -0- | 626 | -0- | -0- | -0- |
| Total | 4,991 | 2,074 | -0- | -0- | -0- | -0- | -0- | 2,256 | -0- | -0- | 17,425 |
| **2005** | | | | | | | | | | | |
| N. Trust (trust) | $1,506 | $1,400 | -0- | -0- | -0- | -0- | -0- | $1,564 | -0- | -0- | -0- |
| N. trust (personal) | 1,306 | 373 | -0- | -0- | -0- | -0- | -0- | 709 | -0- | -0- | -0- |
| Total | 2,812 | 1,773 | -0- | -0- | -0- | -0- | -0- | 2,273 | -0- | -0- | -0- |